My name is James Perlow. I represent Ms. Linda Ramos. This time I'd like to reserve two minutes for rebuttal. All right. Watch your time carefully, Counsel. I will. Your Honors, I'd like to start with a quick recitation of the facts of this case. Ms. Ramos was a jewelry instructor. Counsel, you don't have a lot of time. We've read the briefs. You'd better get right to your argument. Okay. Well, the central issue that we need to consider is whether there was an enforceable settlement agreement that Ms. Ramos signed that Ms. Ramos did not sign. The union represented Ms. Ramos with the community college, and she was presented with a settlement agreement that was drafted by the dean of the school. And on that settlement agreement, there were various provisions that she disagreed with, and she redacted those provisions from that agreement. And the union representative signed that agreement and then later resubmitted the original signed and resubmitted the original settlement agreement to the school. And then at summary judgment, the district court found that that was an enforceable settlement agreement. So the central issue that needs to be determined is whether or not that actually was an enforceable settlement agreement. The union, you don't deny that the union had the capacity to settle. No, Your Honor, I don't deny that the union had the capacity to settle, but the question is whether or not it was an enforceable settlement agreement. We have – So does that mean that your argument is she had to approve the settlement that was made by the union? Well, we also have the argument that the union didn't necessarily represent her in good faith. Essentially – Well, what evidence do you have of bad faith? Because you can't go 301 unless you have unfair and inadequate representation. Right. Well, the evidence we have of bad faith was essentially that the representative Bruce Seidel argued or he presented that there was a violation of – it's essentially a violation of Ms. Ramos' due process rights by his failing to acknowledge that she still had legitimate claims that could be carried – that exist independent of Section 301, namely 42 U.S.C. Section 1983 and retaliatory discharge claims. Well, couldn't it be that he just couldn't get a settlement for her otherwise, other than the terms of the agreement, and that that was the manner and mode in which he felt that he could best serve the interests – her interests and the interests of the union? These were the very central provisions of the agreement that she said, no, I absolutely will not and do not agree to these terms and had them crossed out. But did she have to? Now, that's the point. I mean – I'm sorry to repeat the question. Judge Fletcher asked you a question. Well, did she have to approve the settlement? Yes, Your Honor. We have actually – I think we have case law that says that in – it's Pylon v. University of Minnesota. It says that essentially – Was that cited in your brief? Yes, yes. Basically, it says that even if – What page in your brief do you have that? I don't know which page specifically. It should be on – it will be the second or third argument in the – What's the name of the case again? It's Pylon – or it's – I'm sorry. I'm sorry. I meant to say Dedibali v. St. Luke's Hospital. Pylon is the case that is relied on by the district court and by the respondent in this case. It says the exact opposite, actually. Pylon, right. I'm sorry. That's why I said it's Dedibali. I meant to say Dedibali because Pylon is distinguishable in this case because in Pylon, the appellant actually had an attorney that went over the terms of the agreement, and that – and then – and because the dispute was – and the release was worded clearly and unambiguously, the court found that it was an enforceable settlement agreement, of course. That's distinguishable here because Ms. Ramos did not have an attorney at that time, and had she had an attorney, she certainly wouldn't have followed through with the terms of that agreement. What language in Dedibali are you relying upon to support your argument? This court stated that the – What page? I don't have the page number in front of me for the word I cited, but the language in Dedibali says that claims depend on the meaning of a collective bargaining agreement, but causes of action that only tangentially involve a provision of a collective bargaining agreement are not preempted by Section 301, nor are causes of action which assert non-negotiable rights. But you said that this case supported your argument that she had to approve the terms of the settlement agreement. So what language in this case supports that portion of your argument? Perhaps I was mistaken, Your Honor, in citing that case. Because this goes right to the heart of the collective bargaining agreement. Well, but the other claims, the Section – This is a collective bargaining agreement. That's why they were there. That's why they were dealing with the union. Right. Insofar as they were arguing that the collective bargaining agreement says that a union Yes. And that provision. That's what Ninth Circuit law says also. And what they achieved for her was payment to the end of her term contract. Precisely. But she never – as soon as that payment – she didn't know that this agreement was going to go through. And that payment was directly deposited into her account without her mission and without her knowledge. And as soon as she received that money, she immediately wrote a check to her trial attorney and had that money deposited into her attorney's account. So, essentially, she never had construction use of that money. She never received the money. In fact, that was – It got into her account, did it not? It did. But even at the administrative level, the administrative law judge at the EEOC hearing said that, essentially, she didn't receive that money because it happened without her permission. And she immediately removed it because she knew that she was being – But she had control over it. She did for a very brief period of time. But in light of the fact that she knew that she had been undercut by the union representative, she immediately secured counsel and had that money put into her attorney's trust account in anticipation of litigation. Is there anything in the record that shows any kind of bad faith by the union? Well, it's a question of fact when the union representative, Bruce Seidow, worked underneath the dean of the college. The dean is the one who drafted the resolution of issues agreement that was presented to Mrs. Ramos. She clearly disagreed. And the union representative signed it, which I think is a key point. And he signed it in front of Mrs. Ramos after she had done her redactions. And then it got resubmitted without – he went back and copied it back out without those redactions, signed it again, and then the school signed it. So Mrs. Ramos clearly was absolutely antithetical to what she had anticipated. Well, that's all true, but that doesn't necessarily constitute bad faith on the part of the union. Well, by negotiating on her behalf in contravention of her expressed wishes, I mean, I think it is a violation of the duty of fair representation. Well, sometimes people wish what can't be had, and the union is the one who's to judge and to negotiate and determine. Right, Your Honor. But it's also possible that the union does do this representation in bad faith, particularly when there's a potential conflict of interest. At this time, I see that I'm running into my rebuttal time, so I'd like to reserve the rest of it. Thank you. May it please the Court, I'm L. Shun Richmond, Assistant Attorney General, and I represent Tacoma Community College as well as Dean Vilsenko. In this case, after being dismissed for violating her students' privacy rights, Ms. Ramos basically begged the union for representation. She then benefited from that representation, and as the district court found below, she was bound by that representation. What about counsel's argument that she basically disavowed the terms of the agreement and that the representative was in cahoots with, and that's what he's basically arguing, that the union representative was in cahoots with the dean, and they cooked up an agreement together and filed it in derogation of her specific rights? Well, initially I would point out that Ms. Ramos did not raise those issues in her opening brief. Of course, this Court's precedent indicates that typically it will only review issues that are argued specifically and distinctly in a party's opening brief. Despite that fact, the college and the dean would disagree with that. There's no evidence that anything improper or outside of the authority that she granted to the union through her request and their acceptance of her request to represent her in this issue was in any way inappropriate. And moreover, as I think the Court recognized, Ms. Ramos benefited significantly from this representation. After she begged the union for representation and they gave it to her, after the three of them had considered her request written and, I believe, oral as well, she benefited from that contract and that representation through the fact that she essentially hoped to get her job back. She had been dismissed, and the union obtained her job back. They essentially succeeded in exchange for the release that they agreed to on her behalf. She got her job back for a period of time. Exactly. She was working on quarterly contracts. They let her work that contract out and they just didn't renew it? Not only that, but they rescinded the dismissal letter as well, so there's nothing in her record. So she got a significant benefit in that regard. Without a doubt. Not only that, but she received her full compensation. There was, as I understand it, no dispute that she had violated the student's rights and therefore was subject to termination. She's not even challenging that. That's correct, Your Honor. Certainly that has not been challenged on appeal, and there was no dispute even below that she clearly engaged in inappropriate conduct contrary to policy and federal law in providing the student's information. In this case, the district court focused on that settlement agreement and its language, which indicates very clearly, as is located in the supplemental excerpt of the record, page 59, this agreement constitutes full and final resolution of all issues or claims that the Tacoma Community College Federation Teachers Union, on behalf of Ms. Ramos, has or may have had against Tacoma Community Colleges. And notably, obviously, Ms. Ramos doesn't disagree that the union had the ability to enter into such an agreement. The court focused on well-settled Ninth Circuit case law, which, again, I think the court today acknowledged, that said that when you designate the union as your representative, they're able to conclusively bind that employee, even if there is allegedly some disagreement or indication of a preference for a better settlement agreement, which in this case I don't think was a reasonable indication. But I would point out that the record also reflects that there was no indication, certainly no clear indication that she objected until after the agreement had already been entered into. Well, this is a very different situation. She was not a tenured professor there. Absolutely, that's correct, Your Honor. So she had really no right. They could have chosen not to renew her quarterly agreement for any reason. That's my understanding. As long as it wasn't constitutionally prohibited. I mean, they couldn't say, well, we're not going to rehire you because you're Hispanic or something. But any constitutionally protected reason aside, they could have said, well, we just don't like your teaching. You're not teaching the way we want to, or you've done other things that we don't like, and so we're not going to renew your contract. So she had no vested right to come back in any event, right? That's correct, Your Honor. And, in fact, although they certainly could have dismissed her for any reason, certainly in this situation the college and the vice presidents as well as the dean saw this as a very serious violation. And her options for dealing with this violation were relatively limited. She could only do a letter of reprimand, an administrative leave, or an immediate dismissal. And the recommendation she received from her superiors, the vice president, was to go ahead and dismiss her, that that was more humane. Ultimately, through the union's efforts, that dismissal was rescinded and she received the administrative leave and then her contract wasn't renewed. But that was, again, after the dismissal was removed from her personnel file, and she received over $3,600 in compensation for the remainder of her quarterly contract. Essentially, opposing counsel, Ms. Ramos, I should say, has not essentially addressed or disputed the basis, the precedential basis, the case law basis for the district court's decision below, and has not, in fact, just admitted again that the union could, in fact, enter the agreement that they did. Because that agreement is a valid settlement agreement, as the district court found, and there's been no argument of authority presented to the contrary, the college and the dean ask that the court affirm the decision below. Thank you. Thank you, counsel. Rebuttal. Yes, Your Honor, just a couple of quick points. Concerning the discharge, that she wasn't a tenured professor, it was we were making this 42 U.S.C. Section 1983 claim because she was making protected safety complaints throughout the duration of the 2003-2004 school year because she was fearful for the safety of her students, and over the seven-month period after many, many protected safety complaints. But you can't say that the dismissal was for a pretextual reason. She violated a very sacred rule of the district. You mean the Family Education Rights Privacy Act? Yes. Essentially, the details surrounding that are also dubious. It was a student came to Ms. Ramos two years after she had received a grade and said, I want my grade changed, and for curious reasons, the dean actually mandated that Ms. Ramos change the student's grade from a D to a B, but Ms. Ramos was trying to explain the calculations and merely handed over this form that says this is how the grades are calculated, and it did have other students' grades on it, which. That's it, though. That's a violation of the law. But none of the teachers had been educated on this FERPA Act. None of them were familiar with it. In fact, other teachers admitted to having done the same thing, posted all the grades of their students on the windows. So this FERPA violation we maintain is a red herring, that it was retaliatory discharge for these repeated safety complaints, and whatever shame the dean felt for having failed to act on those complaints when there was a near mishap and almost a disaster at the school. It seemed out of time. All right. Well, thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is United States v. Thomas.
judges: Fletcher, Rawlinson, Ezra